FILED
2013 Jan-15  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| L.L., a minor child, by and through her parents and next friends, LINDA and LEON L., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 7:08-cv-2051-LSC |
| TUSCALOOSA CITY BOARD OF EDUCATION, SUZANNE STERLING, in her individual and official capacities; BECKY INGRAM, in her individual capacity, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

MEMORANDUM OF OPINION

## I. Introduction

Before the Court is Plaintiff L.L.'s motion to alter and amend the summary judgment this Court entered in favor of the Tuscaloosa County Board of Education, Suzanne Sterling, and Becky Ingram (collectively the "Defendants") regarding Plaintiff's Title IX, ADA § 504, and § 1983 claims. (Doc. 84.) The Court has reviewed Plaintiff's contentions as well as the affidavits Plaintiff believes this Court failed to consider. For the reasons discussed below, Plaintiff's motion is due to be denied.

II. Facts[1]

Plaintiff L.L. was an eighth grade student at Oak Hill School, which is a Tuscaloosa City School designated for students with significant disabilities. L.L. suffers from spina bifida, and as a result is paralyzed from the waist down. She also has limited mental faculties, coordination, dexterity and strength. While L.L. is verbal, her voice is weak, so she requires assistance communicating.

On May 7, 2007, L.L.'s science teacher, Defendant Rebecca Ingram, was leading her class from the lunchroom back to the classroom. At some point between the lunchroom and Ms. Ingram's classroom, L.L. was left unattended and was taken to the bathroom of an empty classroom by M.M., another student at Oak Hill School. M.M. suffers from mental retardation and chromosome 2 deletion syndrome.

Melissa Mitchell, a teacher at Oak Hill School, returned to her classroom and discovered M.M. at the door to the bathroom with his hands on his pants and belt. Ms. Mitchell sent M.M. back to his classroom. Ms. Mitchell then discovered L.L. lying on the toilet in the bathroom and crying, with her diaper off, her pants around her ankles, and her shirt pulled up on one side, so that her genitals and breast were exposed. When

---

[1] The facts set out in this opinion are the same facts that were used in the Court's summary judgment opinion.

Ms. Mitchell asked L.L. what happened, L.L. told her M.M. had been messing with her and pointed to her genital area.

Ms. Mitchell called in a teacher's aide and moved L.L. into the classroom where she was examined by the school nurse. M.M. was called into a conference room with several teachers and administrators, where he indicated via nodding and shaking his head that he had taken L.L. to the bathroom and either had, or attempted to have, sex with her.

III. Standard

The decision whether to alter or amend a judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure "is committed to the sound discretion of the district judge." *American Home Assurance Co. v. Glenn Estess & Associates, Inc.*, 763 F.2d 1237, 1238 (11th Cir. 1985). Because Plaintiff seeks to alter or amend an order for summary judgment, the summary judgment standard is applicable to this Court's decision.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met its burden, Rule 56(e) " requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). " A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.' " *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    Analysis

As cause for her motion, Plaintiff asserts that a key element of evidentiary proof of the Defendants' prior knowledge—the affidavit of M.M.'s mother, H.M. (Doc. 68-4), and the affidavit of Dr. Ashraf Syed, M.M.'s treating neurologist (Doc. 68-5)—was not considered by the Court. (Doc. 84 at 2.) Plaintiff argues that the evidence contained in H.M.'s and Dr. Syed's affidavits shows a known propensity for sexual aggression. (Doc. 84 at 6.) In particular, Plaintiff points to H.M.'s statement, " I was told by school officials and teachers that my son's conduct was increasingly sexual and was offensive to other students and staff." (Doc. 78-1 at 1.) This statement is consistent with the Teacher Referral Forms (the "Forms") submitted by the Defendants. The Forms describe an instance on November 9, 2006, where M.M. made " several obscene gestures to Mrs. Mitchell when reprimanded or redirected" after he took off his belt " with the gesture of he was going to use it on [her]." (Doc. 61-12 at 9.) The Forms also describe M.M. being " disruptive in class" and making " obscene gestures to teachers in the classroom" on November 14, 2006. (*Id.* at 10.) Also in November of 2006, M.M. was suspended from the bus for obscene gestures and statements on the bus. (*Id.* at 11.) Specifically, M.M. told the bus aide " 'f_ _ _ you' while pulling on his privates and standing on the bus, telling the aide, 's_ _ _ me.' " (Doc. 68 at 25; Doc. 61-12 at 11.) According to H.M.'s affidavit, Oak Hill School

officials promised to increase their supervision over M.M. and to work to reduce his sexual and offensive conduct towards other students and staff. (Doc. 78-1 at 1.)

There is also a notice of suspension dated April 19, 2007 for "vulgar/obscene" conduct after M.M. was found with another student whose pants had been pulled down "where you could see her hips." (Doc. 61-12 at 12-13.) When a teachers' aid asked M.M. what he was doing, "he pointed to his private area (genitals)." (*Id.*) H.M. states in her affidavit that after this incident, she was told by Ms. Sterling, Ms. Ingram, and other school officials that M.M. admitted to them that he had pulled the student's clothes down and had attempted some sort of sexual contact. (Doc. 78-1 at 2.)

Following this incident, H.M. went to the Stillman Heights Education Center to discuss her concerns regarding M.M.'s suspension and told the Education Agency Official that she did not feel M.M. was being supervised properly. As a result, a meeting was scheduled for the following week. (Doc. 61-12 at 14.) At that meeting, H.M. explained that M.M.'s medications had been changed to address his behavior and sexual issues. (Doc. 61-12 at 15.) The conference record indicates that "stop training" behavior intervention would be implemented and that "when IEP reconvenes behavior intervention should be addressed to include consequences to inappropriate sexual activity." (*Id.*)

According to Dr. Syed's affidavit, "Aggressive behavior, like that noted in M.M., typically develops into sexual aggression as the subject ages and experiences increases in hormonal activity, as is the case with M.M." (Doc. 68-5 at 1.) Dr. Syed also states that two months before M.M.'s attack on L.L., H.M. reported that M.M. was having problems with sexual aggression in school. (*Id.*) As a result, Dr. Syed recommended an aide be assigned to him to prevent any inappropriate or indecent behaviors.[2] (*Id.*) Dr. Syed next saw M.M. on April 24, 2007, after he was found in the hallway with the student whose pants were pulled down. (Doc. 68-5 at 2.) Dr. Syed characterized this incident as a "continued instance[] of sexual aggression and a specific instance of such sexual aggression towards another female student at Oak Hill School." (*Id.*) Dr. Syed again recommended that M.M. "needs an aide to monitor his actions." (*Id.*) Dr. Syed saw M.M. again after his attack on L.L., and it was not until that point that Dr. Syed was contacted by Oak Hill to provide any information and assist in developing a plan for M.M. (Doc. 68-5 at 2.)

Plaintiff argues that these submissions reveal the Defendants' prior knowledge of M.M.'s propensity for sexual aggression and that the Defendants were already required to provide "one on one" supervision of M.M. prior to his attack on L.L.

---

[2]The affidavit does not reference to whom Dr. Syed made this recommendation. Because he later says he was not contacted by the school until after May 7, 2007, it is assumed that this recommendation was made to H.M., and not to personnel at Oak Hill.

(Doc. 84 at 2, 4.) Although Plaintiff is correct that these affidavits were not specifically addressed in the previous Memorandum of Opinion, filed on March 28, 2012, the Court did consider the information therein. (Doc. 82.) However, upon Plaintiff's motion, the Court will reconsider its judgment as to portions of the Defendants' motion for summary judgment with specific reference to the evidence Plaintiff now contends was not considered.

A.    Title IX Analaysis

Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Although Title IX does not expressly permit private enforcement suits, the Supreme Court has found an implied private right of action for individuals to enforce the mandates of Title IX" and "that private individuals can obtain monetary damages" under Title IX. *Williams v. Bd. of Regents*, 477 F.3d 1282, 1293 (11th Cir. 2007). In the school context, sexual harassment is discrimination under Title IX, and a plaintiff may be able to recover for student-on-student harassment in certain narrow circumstances. *Id.* In assessing a Title IX claim based on student-on-student harassment, the Court "must ask two questions: (1) was the school board deliberately indifferent to sexual harassment about which it had actual knowledge; and (2) was the

sexual harassment so severe, pervasive, and objectively offensive that it can be said to have systemically deprived the victims of access to the educational opportunities of the school?" *Hawkins v. Sarasota County School Bd.,* 322 F.3d 1279, 1285 (11th Cir. 2003).

### 1. Actual Knowledge

In order for a plaintiff to recover for a violation of Title IX based on student-on-student harassment, "an 'appropriate person' must have actual knowledge of the discrimination or harassment the plaintiff alleges occured." *Williams*, 477 F.3d at 1293. " '[A]n 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.' " *Id.* (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). In *Williams*, an appropriate person was found to have actual knowledge when the student responsible for a student-on-student attack was recruited and given a full scholarship to play basketball by the President and Athletic Director of the University of Georgia, they knew that he had been dismissed from two other basketball programs for sexual harassment and sexual assault, and they had authority to take corrective measures on behalf of the University of Georgia to end the alleged discrimination. *Id.* 477 F.3d at 1282. In *Doe v. School Bd. of Broward County, Fla.*, 604 F.3d 1248 (11th Cir. 2010), an appropriate person was found to have actual knowledge when a high school math

teacher was twice reported to the school's principal by students for sexual harassment before his attack on the plaintiff, and the principal could institute corrective measures in response to known harassment. 604 F.3d at 1248, 55.

In this case, the affidavits show that both H.M. and Dr. Syed were aware of M.M.'s sexual aggression, and that H.M. had been in contact with Oak Hill about M.M.'s behavior problems. Dr. Syed's knowledge of M.M.'s behavioral problems and his recommendation that M.M. receive one-on-one supervision is not relevant to Oak Hill's knowledge of M.M.'s propensity for sexual assault because Dr. Syed's recommendation was never communicated to school officials.

However, M.M. reportedly admitting to an attempted sexual act on another student is relevant to Oak Hill's knowledge. (Doc. 78-1 at 2.) In *Doe*, the court stated that "[t]he simple fact that [the] prior incidents [of sexual harassment] were unconfirmed and did not escalate to a violent sexual assault akin to Doe's cannot as a matter of law absolve the School Board of Title IX liability." 604 F.3d at 1259. Further, "lesser harassment may still provide actual notice of sexually violent conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter." *Id.* Although M.M.'s previous conduct was unconfirmed and may not have escalated to an actual sexual assault, the attempt on the other student could be sufficient to provide notice to the school of M.M.'s propensity for sexual assault. Additionally, H.M.'s

affidavit may be sufficient for summary judgment purposes to show that an appropriate person had notice of M.M.'s propensity for sexual assault. Thus, the Defendants may have had the actual knowledge required for damages under Title IX, contrary to this Court's original determination. However, this is not the end of the Court's inquiry.

2.    Deliberate Indifference

As noted in this Court's previous opinion, a Title IX claim requires not only that the school have knowledge, but also that the Board was deliberately indifferent to that knowledge. A plaintiff can show deliberate indifference by " present[ing] some evidence that the municipality knew of a need to . . . supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). The United States Supreme Court has held that " the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis v. Monroe Co. Bd. of Educ.*, 526 U.S. 629, 645 (1999) (internal quotations omitted).  This " does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. Rather, the deliberate indifference standard requires " an official decision by the recipient [of federal funds] not to remedy the violation." *Gebser*, 524 U.S. at 290.

In *Davis*, the Supreme Court found that the deliberate indifference may exist where the defendants had actual notice of possible harassment, but "made no effort whatsoever either to investigate or to put an end to the harassment." 526 U.S. at 654. In *Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279 (11th Cir. 2005), a case involving a Title IX claim based on teacher-on-student harassment, the Eleventh Circuit found deliberate indifference could not exist where the defendants responded to each report of misconduct they received. *Id.* at 1285 (no deliberate indifference because defendants "responded to the reports in October 1998, March 2001, and July 2001 by investigating the allegations and interviewing the relevant parties. School officials also consistently monitored [the assailant's] conduct and warned her about her interaction with students").

In this case, Oak Hill personnel responded to M.M.'s misconduct prior to the incident with L.L. by temporarily suspending M.M.'s privileges, suspending him from school, and holding parent-teacher conferences with his mother. For the incident on the bus, M.M. was suspended from bus privileges for three weeks. (Doc. 61-4 at 3.) After the incident with the student in the hallway, M.M. was suspended for one day and a parent-teacher conference was held with M.M. and H.M. to address M.M.'s behavior. (*Id.* at 4.) The Defendants' responses are similar to the defendants' responses in *Sauls*, where the Eleventh Circuit found that deliberate indifference could

not exist. 399 F.3d at 1285. Although the responses were ultimately ineffective in preventing the attack on L.L., it cannot be said that the Defendants were deliberately indifferent because they did not make a deliberate choice not to take any action. *See Davis,* 526 U.S. at 654. As this Court concluded in its previous opinion, it cannot be said that the Defendants were deliberately indifferent.

### 3.    Denial of Access

Finally, in order for a plaintiff to recover for a violation of Title IX based on student-on-student harassment " the discrimination must be 'so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit.' " *Williams*, 477 F.3d at 1293 (quoting *Davis*, 526 U.S. at 633). In *Williams*, the Eleventh Circuit found that a sexual assault effectively barred the victim's access to an educational opportunity or benefit because the school waited eight months after the attack before conducting a disciplinary hearing to determine whether to sanction the alleged assailants. *Id.* at 1298–99. When faced with the decision to leave or return to school, the school's " response to her complaints did nothing to assuage her concerns of a future attack should she return." *Id.* at 1298. The failure of the school to act after the attack likely prevented the victim from returning to the university to continue her education. *Id.* at 1299.

In this case, Oak Hill school officials immediately investigated the incident, notified law enforcement, and contacted L.L.'s parents. (Doc. 61 D-404.) M.M. was temporarily placed in the "homebound educational services" until a behavioral specialist was called in to reassess M.M.'s Behavior Intervention Plan. As a result of a meeting with the behavioral specialist, it was decided that M.M. would have a one-on-one aide to accompany him during school hours. (Doc. 61-9 at 68.) This is undeniably different than the situation in *Williams*, where the school did nothing to deter future attacks, preventing the victim from returning to school, thus depriving her of access to educational opportunities. The facts alleged in the affidavits occurred before M.M.'s attack on L.L. and were the subject of efforts by Oak Hill officials to deal with the situation. Plaintiff cannot show that the school's actions effectively barred L.L. from access to an educational opportunity or benefit.

B.      Intentional Discrimination Violating ADA or § 504

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In order to sustain a claim under § 504, a plaintiff must demonstrate that the defendants' actions were the result of intentional

discrimination on the part of the defendants. *Wood v. President and Trustees of Spring Hill College in City of Mobile*, 978 F.2d 1214, 1219 (11th Cir. 1992). At the time of this Court's original opinion, the Eleventh Circuit had "not decided whether to evaluate claims of intentional discrimination under section 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010). Since then, the Eleventh Circuit has clarified that "a plaintiff my demonstrate discriminatory intent through a showing of deliberate indifference." *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345–48 (11th Cir. 2012) ("The deliberate indifference standard best reflects the purposes of § 504 while unambiguously providing the notice-and-opportunity requirements of Spending Clause legislation. A lower standard would fail to provide the notice-and-opportunity requirements to [Rehabilitation Act] defendants, while a higher standard—requiring discriminatory animus—would run counter to congressional intent as it would inhibit § 504's ability to reach knowing discrimination in the absence of animus.")

The deliberate indifference standard requires a plaintiff to "prove that the defendant knew that harm to a federally protected right was substantially likely and that the defendant failed to act on that likelihood." *T.W.*, 610 F.3d at 604. As previously explained, although the Defendants' response to M.M.'s prior misconduct

was ultimately ineffective in preventing the attack on L.L., it cannot be said that the Defendants were deliberately indifferent because they did not make a deliberate choice not to take any action. *See supra* Part IV.A.2. Because it cannot be said that the Defendants were deliberately indifferent, Plaintiff cannot meet all the necessary elements of a § 504 claim. Therefore, summary judgment was properly granted as to Plaintiff's § 504 claim.

C.    Liability Under § 1983

Plaintiff brings a § 1983 claim against the Defendants, alleging that her Substantive Due Process rights of the Fourteenth Amendment were violated when the Defendants were deliberately indifferent to the protection of her liberty interest in her bodily integrity. Section 1983 provides that " [e]very person who, under color of any [law] of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983. Stated another way, § 1983 allows a plaintiff to sue an individual who, while acting under color of state law, deprived her of a constitutional right. *Collier v. Dickinson*, 477 F.3d 1306, 1307 (11th Cir. 2007). Municipalities and other local government units are " persons" within the meaning of § 1983, and can be sued directly under the statute for monetary,

declaratory, or injunctive relief. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). In order " to impose § 1983 liability on a municipality, a plaintiff must show that: (1) his constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir.2004) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). In reconsidering its prior decision, the Court remains convinced that Plaintiff cannot show that Oak Hill had a custom or policy that constituted deliberate indifference to her constitutional rights.

### 1.    Substantive Due Process Violation

The Fourteenth Amendment prohibits States and their components from " depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Substantive Due Process protects individual liberty against certain government actions, irrespective of the procedural fairness used to implement them. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). " [T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). However, as a general rule, " nothing in the language of the Due Process Clause itself requires the State to protect life, liberty, and property of its

citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). " The Due Process Clause exerts limitations on a State's power to act, not as a guarantee of certain minimum levels of safety." *Id.* at 195. Only in certain limited circumstances does the Constitution require affirmative duties of care and protection to particular individuals. *Id.* at 198.

As originally defined by the Supreme Court, those circumstances exist where (1) the State takes a person into custody, confining him against his will; and (2) when the State creates the danger or renders a person more vulnerable to an existing danger. *Id.* at 198-201.  The Eleventh Circuit has recognized that the Supreme Court has superceded the latter "state-created danger" category. Now, the government's affirmative acts " rise to the level of a substantive due process violation [when] the act can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing *Collins*, 503 U.S. at 128). L.L. may have only succeeded in her Substantive Due Process Clause claim if she could have shown that the Board owed her a duty to protect her from a third-party actor because one of these limited circumstances existed.

       i.     Duty owed because the State takes a person into custody

Mere compulsory attendance at a public school does not give rise to a constitutional duty of protection under the Due Process Clause under the custodial exception outlined in *DeShaney* because public schools generally lack the requisite control over children to impose such a duty of care upon these institutions. *Wyke v. Polk County School Board*, 129 F.3d 560, 569 (11th Cir. 1997). The Plaintiff has not alleged that L.L.'s situation was different from that of any other child attending public school such that it would trigger the custody exception. In a factually similar, but non-binding case, a special education student was sexually assaulted by another pupil on a special education school bus. *Worthington v. Elmore County Bd. of Ed.*, 160 Fed. Appx. 877 (11th Cir. 2005). The court held that there was no special relationship or duty on the part of the Board of Education, even though Plaintiff was forced to attend a special school for children with learning disabilities and behavioral problems, forced to ride the bus, and suffered from known mental, emotional, and behavioral disabilities. *Id.* at 881. Similarly, despite L.L.'s disabilities, no constitutional duty of protection was created under the custody exception in this case.

ii.     Duty owed because the State creates the danger

Under the second exception, if the conduct of the governmental actor "shocks the conscience," a constitutional violation may be present.  The government's affirmative acts "rise to the level of a substantive due process violation [when] the act

can be characterized as arbitrary or conscience shocking in a constitutional sense." *Waddell*, 329 at 1305 (citing *Collins*, 503 U.S. at 128). "To rise to the conscience-shocking level, conduct most likely must be 'intended to injure in some way unjustifiable by any government interest.'" *Davis v. Carter*, 555 F.3d 979, 982 (11th Cir. 2009) (quoting *Lewis*, 523 U.S. at 849). Conduct by a government actor that would amount to an intentional tort under state law would not, without more, rise to the level of a constitutional violation. *See Dacosta v. Nwachukwa*, 304 F.3d 1045, 1048 (11th Cir. 2002). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Waddell*, 329 F.3d at 1305 (citing Lewis).

As noted in the Court's previous opinion, there are very few cases in the Eleventh Circuit in which the circumstances actually give rise to a constitutional violation. Only in the limited context of due-process claims based on excessive corporal punishment has the court held that the intentional conduct of a school educator may shock the conscience. *See Neal ex rel. Neal v. Fulton County Bd. of Ed.*, 229 F.3d 1069 (11th Cir. 2000) (high school coach intentionally struck a student with a metal weight lock, knocking the student's eye out of its socket, as a form of punishment for his involvement in a fight with another student); *Kirkland v. Greene County Bd. of Ed.*, 347 F.3d 903 (11th Cir. 2003) (high school principal violated a

student's constitutional rights after he struck the student with a metal cane in the head, ribs, and back for disciplinary reasons).

The Plaintiff has alleged that the Defendants knew of M.M.'s history of misconduct based on the affidavit of H.M., but were deliberately indifferent to the safety of L.L. and their own duties to protect her. (Doc. 68 at 43; Doc. 84 at 5–7.) This argument fails for two reasons. First, as noted above, the Defendants were not deliberately indifferent. *See supra* Part IV.A.2. Second, even if they were deliberately indifferent, the Eleventh Circuit "has been explicit in stating that 'deliberate indifference' is insufficient to constitute a due-process violation in a non-custodial setting." *Nix v. Franklin County Sch. Dist.*, 311 F.3d 1373, 1377 (11th Cir. 2002) (finding high school teacher's actions were not conscience-shocking, where student death resulted from student touching a live wire after the teacher instructed his students to hold on to the wire, informed his students they might die if they touched the exposed part of the wire, then turned away to answer a question). The Court is not convinced that it was wrong when it found "no precedent to support the contention that a government agent's failure to protect from the intentional acts of a third party can be characterized as arbitrary or conscience shocking in a constitutional sense." (Doc. 82 at 21.) Further, the Court remains convinced that factually-similar cases it noted in the previous opinion from other circuits correctly applied the law. Those

cases—addressing whether sexual assaults on school children can give rise to a § 1983 claim against a government agent under the "state-created danger" category—generally found that the school district does not have a duty to protect students from assault. *See Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993) (finding no duty to protect a mentally retarded high school student from sexual assault and rape from another student with a history of sexual aggression towards other students because, under *DeShaney*, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf, not the individual's own limitations—such as the plaintiff's mental retardation—that gives rise to the constitutional duty to protect); *Doe v. Hillsboro Independent School Dist.*, 113 F.3d 1412 (5th Cir. 1997) (finding no duty of school officials to protect a middle school student who was raped by a school custodian who had a known criminal record); *see also Doe v. Sabine Parish School Bd.*, 24 F. Supp. 2d 655 (W.D. La. 1998) (finding no duty on the part of school officials to protect a kindergarten student from sexual assault from another student with a history of sexual aggression towards other students).

Accordingly, Plaintiff cannot establish that she falls within the narrow exceptions to the general rule that the State does not owe a duty to protect the life, liberty, and property of its citizens against invasion by private actors. Because the Defendants are state actors that did not have a duty to protect Plaintiff from the

actions of M.M., Plaintiff cannot show that her Substantive Due Process rights were violated, and the Court was correct in granting the Board's motion for summary judgment as to Plaintiff's § 1983 claims.

### 2.      Custom or Policy

Even if Plaintiff could show that her constitutional rights were violated, she cannot show that there was a custom or policy that constituted deliberate indifference to her Substantive Due Process rights. A local government body is liable under § 1983 " when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978). " A plaintiff can establish § 1983 liability by identifying that she has been deprived of constitutional rights by either an express policy or a 'widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom and usage with the force of law.' " *Cuesta v. School Bd. of Miami-Dade County, Fla.*, 285 F.3d 962, 966 (11th Cir. 2002) (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)).

Plaintiff argued that " The Board's failures adequately to train its employees in the prevention of this type of injury and to have adequate safeguards and responsive policies to sexual harassment and assault at Oak Hill School are the types of

substantive due process claims for which municipal entities may be liable." (Doc. 68 at 43.) Plaintiff cited *Canton v. Harris*, 489 U.S. 378, 387 (1989) in support of this assertion. In *Canton*, the Court stated that "if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *Id.* However, the Court also cautions that the "failure to train" can only be the basis of liability under §1983 in very limited circumstances, where the failure to train amounts to deliberate indifference. *Id.* As discussed above, the Defendants were not deliberately indifferent to L.L.'s constitutional rights. *See supra* Part IV.A.2.

Because Plaintiff failed to establish that there was a custom or policy that constituted deliberate indifference to her Substantive Due Process rights, the Board's motion for summary judgment as to Plaintiff's § 1983 claim was properly granted.

D.    Qualified Immunity

The Court also remains convinced that—even if liability under § 1983 did exist in this case—Defendants Suzanne Sterling and Rebecca Ingram are entitled to summary judgment based on qualified immunity. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights

of which a reasonable person would have known.' " *Sherrod v. Johnson*, 667 F.3d 1359,

1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The

Eleventh Circuit engages in a two-part analysis to determine whether a government

official is entitled to the defense of qualified immunity. " First, the official must prove

that the allegedly unconstitutional conduct occurred while he was acting within the

scope of his discretionary authority. Second, if the official meets that burden, the

plaintiff must prove that the official's conduct violated clearly established law."

*Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted).

### 1.    Acting Within the Scope of Discretionary Authority

Plaintiff has not challenged the determination that Sterling and Ingram were

acting within the scope of their discretionary authority, but the Court will nonetheless

reconsider this determination. A government employee is acting within the scope of

discretionary authority when the acts in question " are of a type that fell within the

employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252,

1265 (11th Cir. 2004). Acts fall within the government employee's job responsibilities

when he is " (a) performing a legitimate job-related function (that is, pursuing a

job-related goal), (b) through means that were within his power to utilize." *Id.* The

inquiry is not whether it was within the defendant's authority to commit the allegedly

improper act. *Harbert Int'l,* 157 F.3d at 1282. Instead, " a court must ask whether the

act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties," which "should be determined by the relation of the injury complained of to the duties entrusted to the officer." *Id.*

As this Court previously found, "the assault occurred when school personnel left L.L. and M.M. unattended at some point while leading L.L.'s class from the lunchroom back to the classroom. Formation and implementation of procedures for supervising students are within Defendants' discretionary duties, even if Defendants did not do all that was required of them in carrying out those duties. Therefore, Defendants meet the first prong for qualified immunity." (Doc. 82 at 26.) This analysis is unrelated to the evidence Plaintiff contends was not included in the previous opinion, and the Court remains convinced that the law was correctly applied regarding the first prong of qualified immunity.

### 2.   Conduct Violated Clearly Established Law

Once the public official proves " that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted), " the burden shifts to the plaintiffs to show that qualified immunity is inappropriate," *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). The Eleventh Circuit mandates a two-part test to

ascertain whether such an allegation has been sufficiently made.  First, the Court must determine whether the plaintiff's allegations, if true, establish a constitutional violation.  *Vinyard v. Wilson*, 311 F.3d at 1346 (11th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 735 (2002)).  Second, " [i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.' "  *Vinyard*, 311 F.3d at 1346 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

As an initial matter, Plaintiff cannot establish that her constitutional rights were violated by the Defendants under her version of the facts. *See supra* Part IV.C.1. However, even if she could, the Court was correct in determining that any such constitutional right was not clearly established. A public official will be denied qualified immunity only if the plaintiff convinces the Court that the constitutional right at issue was clearly established at the time of the alleged violation to the degree that these defendants had "fair warning" that their conduct violated the plaintiff's constitutional rights.  *See Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003).  " In many—if not most—instances, the apparency of an unlawful action will be established by (if it can be established at all) preexisting caselaw which is sufficiently similar in facts to the facts confronting an officer, such that we can say every objectively reasonable officer would have been on 'fair notice' that the behavior

violated a constitutional right." *Id.* In addition, " [g]eneral statements of the law contained within the Constitution, statute, or caselaw may sometimes provide 'fair warning' of unlawful conduct." *Id.*

Plaintiff alleges Ingram and Sterling " were aware of their duty to monitor L.L. at all times, and to protect her from injury by other students." (Doc. 1 at 10.) However, as this Court originally noted, this is not a statement of law contained within the Constitution, statute, or caselaw. As noted above, the Eleventh Circuit has held that public schools generally do not have the requisite level of control over children to give rise to a constitutional duty to protect them from third-party actors. *See supra* Part IV.C.1.i. *See also Wyke*, 129 F.3d at 569. In *Williams v. Bd. of Regents*, the court held that the defendants were entitled to qualified immunity, despite the allegation that they knew the past criminal and disciplinary history of plaintiff's attacker, and yet recruited him to play basketball anyway. 477 F.3d at 1301. The court found that, at a minimum, the defendants acted recklessly, and because the plaintiff failed to present any cases that show the defendants violated her clearly established equal protection rights by recruiting and admitting an individual like the attacker, she could not meet her burden under the second step of the qualified immunity analysis. *Id.* As in *Williams*, Plaintiff did not originally put forth any cases that show the Defendants

violated her clearly established equal protection rights, and she has subsequently not provided any such cases either.

Because the Defendants were acting within the scope of their duties and Plaintiff cannot meet her burden of proof to show that qualified immunity is inappropriate, Defendants Sterling and Ingram remain entitled to qualified immunity as to Plaintiff's § 1983 claim against them in their individual capacities.

E.    State Law Claims

Once again, because there are no federal law claims remaining, the Court may decline to exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3). In accordance with the Eleventh Circuit's desire that district courts dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial, *Raney v. Allstate Ins. Co.* 370 F.3d 1086, 1089 (11th Cir. 2004), this Court exercised its discretion and declined supplemental jurisdiction over the claims in counts 4, 5, 6, and 7 of the Complaint. (Doc. 82 at 29.) Because the remaining claims involve issues that will be resolved solely in accordance with state law, the Court finds no reason to alter its previous judgment.

V. Conclusion

For the reasons stated above, Plaintiff's motion to alter and amend the judgment is due to be denied. A separate order will be entered.

Done this 15th day of January 2013.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

171032